PRIMITIVO HERNÁNDEZ ET AL., Plaintiffs and Appellees, *v.* ISMAEL ACOSTA PADILLA ET AL., Defendants and Appellees.

No. 8910.   Argued June 1, 1944.—Decided November 24, 1944.

*Oscar Souffront* for appellants. *J. Alemañy Sosa* for appellees.

Mr. Justice Todd, Jr., delivered the opinion of the court.

This is an action for the recovery of damages for the death of plaintiffs' son, a child six years of age. The District Court of Mayagüez adjudged the defendants to pay $3,500 as compensation, and $300 as attorney's fees.

Although the defendants have assigned herein nine errors as committed by the court below, we shall consider and decide them jointly because, in our opinion, most of them and in different ways involve only one fundamental question, to wit: Did the trial court act with bias, prejudice, and partiality or commit manifest error in the weighing of the evidence? Let us pass upon the facts and the evidence.

The plaintiffs have been living for some years in a house, owned by Miguel Carlo, Pabón, which is situated in a farm belonging to the latter, in the ward of Llanos Costa of the Municipality of Cabo Rojo. The house is divided in two sections: one, in the shape of a rectangle which is the main portion of the house containing the parlor and the bedroom,

and another, a rough shed annexed to the backyard of the house, in which the kitchen is located. The front of said house is at a distance of about 114 meters from a road which runs in the direction from east to west and reaches the sea where Mr. Miguel Carlo Pabón has his salt deposits. From said road a private way takes off which crosses the property of Mr. Carlo from south to north, and goes around the above-mentioned house in a curve, passing alongside the backyard of the kitchen. Defendant Ismael Acosta Padilla was one of Mr. Carlo's customers in the salt business, and as such, he was permitted to drive his trucks along the private road, using the same frequently and passing by the house of the plaintiffs, it being known to him that children lived in that house.

On July 26, 1943, about ten o'clock in the morning, said defendant was driving his own truck loaded with salt. On reaching the gate where the private road takes off, he sounded the claxon, turned, and continued along the private road in the direction south to north, at a moderate speed. Plaintiff Antonia Camacho was in the kitchen of her house with her son Pedrito Hernández, six years of age. When the truck was turning the curve around the house, the boy ran out of the kitchen into the backyard, seemingly with the in-tention of crossing the road, and struck the right rear side of the truck. The injury which the boy received in his head was such that he instantly fell to the ground dead on the very boundary line between the backyard and the road.

In order to correctly weigh the facts, we must give a con-cise statement of the testimony of the witnesses for both parties. We shall only omit the testimony of the photo-grapher who simply confined himself to identifying the photo-graphs which he had taken at the place of the occurrence. The evidence presented by the plaintiffs was as follows:

Primitivo Hernández testified that he reached his home on this day of the occurrence at about ten thirty in the morning, and found his son Pedrito lying on the bed

dead; that he found a blood stain in the backyard of the house, at a distance of *1 meter 70 centimeters* from the corner of the house, and at *5 meters 40 centimeters* from the door of the kitchen; that the private road has a width of 4 meters, but on the curve it is 7 meters wide; that the trees bordering the bend of the road are at a distance of about 8 or 13 meters from the house; and from the first tree to the corner of the house, where the curve enlarges, there are 11 meters 30 centimeters; that the defendant passed frequently by his house, sometimes two or three times a day; that on a certain occasion the defendant killed a dog belonging to witness and that he called his attention in the sense that he should exercise greater care because there were small children in the house.

Santos Colberg stated that on the day of the occurrence he was going towards plaintiff's house of whom he was a neighbor; that when he was at a distance of about 40 or 50 steps he saw a truck coming at a minimum speed and *heard when the truck sounded its horn;* that there were north winds; that the truck was approaching the house when the child came out from the back of the house towards the road, but that he did not see the accident because the truck obstructed the view; that the truck *must have hit the child with the rear part of the right side, since the front part had already passed;* that the blood stain where the boy fell was in front of the kitchen, more or less on the bordering line between the backyard and the road.

Agustín Montero testified that on the day of the occurrence he was coming from the salt deposits of Miguel Carlo Pabón, were he worked, on the truck of Ismael Acosta Padilla, sitting in front with the latter; that on that day there were heavy north winds; that the truck stopped at the gate which opens on the private road in question, sounded the claxon and then continued at a minimum speed along said private road, *which widens about two meters on reaching the house,* and passed at a distance of about *two or three* meters

from the kitchen, but the crate of the truck passed closer, at about a meter and one-half from the house itself; that when it was passing by he saw the boy run out of the kitchen to cross the road; that the laborer who was at the back of the truck said "Stop, you killed the child," and the truck stopped immediately. It only took them one or two minutes to get down and the boy was already dead. The blood where the boy fell was on the border line between the backyard and the road. Although he did not see the collision of the boy with the truck, the vehicle must have hit him with the rear part. The main part of the house obstructs the view in such a way that a person going out of the kitchen towards the road can not see a car coming from the front.

Antonia Camacho, mother of the child, stated that on the day of the accident she was cooking and had the child with her, when *he jumped and ran out to the road. At the same time the truck was passing by,* and when she looked she saw the boy lying on the backyard, from where she carried him dead. She did not hear the truck nor the sounding of the claxon, and only knew about its passing when she heard it pass by the kitchen, at the very moment that she looked out. She did not see when the truck killed the boy because she had her back turned. She picked the child from the ground nearer to the backyard of the house than to the road.

This was all the evidence adduced by the plaintiffs and then that for the defendants continued with the testimony of:

Alfredo Acosta, who testified that on the day of the occurrence he was riding on top of the salt bags on the back of the truck, which was being driven at a speed of 6 or 8 miles; that the defendant driver *sounded the claxon at the gate where the private road takes off;* that on reaching the house, he heard no signal from the truck; that as they passed the house he *saw a child run out without noticing that the truck was passing,* and hit the crate (platform) of the truck on the right side, falling to the ground; that the truck stopped

immediately, close to the house. That a person going from the house to the road can not see a truck coming towards the front, but if the truck has passed the curve he can see it and that the truck in this case had already passed the curve and that even the rear part of the truck had passed it.

Ismael Acosta Padilla, the co-defendant, testified that he had been passing by the house of Primitivo Hernández for two or three years, and on several occasions had seen children there; that on the day of the accident he returned from the salt deposits of Don Miguel Carlo driving his own truck; that before reaching the house, when he got to the gate, he stopped and sounded the horn, and then continued on second gear at a speed of 8 or 10 miles; that he slowed down at the curve; that before turning the curve he did not sound the claxon; that he did not see anyone cross the road; that when taking the curve at the angle formed by the main part of the house, and as he passed alongside the house, *he felt an impact* against the right side of the vehicle and stopped the truck in front of the kitchen; that at no time did he see the child.

Dr. Enrique Encarnación testified that he had examined the body (not an autopsy) of the child the day after the accident, and the same showed two heavy blows, one on its right leg, and another on the forehead. That his death was due to a traumatic shock, caused by a brutal blow reflected on the brains, but that the nature of the injuries showed that the child could not have been run over by the truck.

After weighing all this evidence the lower court reached the conclusion that "the proximate and immediate cause of said child's death was the fault and negligence of the driver Ismael Acosta Padilla in driving his truck on the private road . . . . without giving any warning of its proximity to the house occupied by the plaintiffs and their children, notwithstanding the existence of a sharp curve on reaching the house, and the latter standing almost in the center of the

curve in the road which grows sharper and widens when it turns around the house, and although there was sufficient space for the truck to pass by at some distance of the house, he drove the same close to the house in such a way that it would have been difficult even for a grown-up person, who should try to leave through the back door of the house, to avoid being run over and killed by the truck in the same place where the child, plaintiffs' son, was killed." As to the act of the child, the court states that "the most that can be said . . . is that the child ran out of the kitchen to the road without noticing that the truck was passing at that moment" and it held that it was not negligence because considering his age "he could be charged with negligence only if he had performed any act which other children of like age and of like conditions and circumstances would have performed in an entirely different manner." The court further stated that the truck was going slow at the time of the accident and had sounded the claxon at the gate.

In brief, the court believed that the proximate cause of the accident, consisting in the negligence on the part of defendant Acosta, was due: 1st, to the failure of giving any warning before taking the curve, knowing that there were children around that place; and 2d, in taking the curve too close to plaintiff's house when there was sufficient space in the road to have passed at a greater distance from the house.

We have repeatedly and consistently upheld in our decisions the doctrine that we shall not reverse a judgment grounded on an error like the one raised here, unless the existence of the same is satisfactorily shown. We are always inclined to respect the findings of fact made by the lower courts if when weighing the evidence and settling the conflict thereof they conform their decisions to the facts established or tended to be established by the evidence itself. However, when it appears from the very evidence that there is no conflict and that in the weighing of the essential fact involved, the court acted with bias, prejudice, and partial-

ity, or that it committed manifest error, then and only in that case do we feel bound to reverse the judgment.

We have carefully examined the different questions raised in the lengthy and elaborate brief filed by the appellants but we are not convinced that the trial court, under the attendant circumstances herein, was moved by bias, prejudice, and partiality or that it committed manifest error in the weighing of the evidence. The case is, as we said in *Castro* v. *González*, 58 P.R.R. 369, 383, ''on the border line and could have been decided in one way or another—according to the evidence believed by the court,'' especially as to the time when the child ran out of the kitchen of the house. The lower court did not believe the evidence in the sense that the truck was passing in front of the kitchen when the child ran out, but it believed the testimony of plaintiffs' witnesses as well as of defendant himself, corroborated by an ocular inspection, that the place where the child fell dead, as shown by the blood stains, was on the boundary line between the road and the backyard and that the truck was taking the curve around the house when, as testified by defendant Acosta, he suddenly felt the blow.

We believe there is a fact of the utmost importance in this case which has been proved by the plaintiffs and admitted by the defendant—that the latter knew that there were children in the house, and further that the plaintiff had called his attention when he ran over a dog, in the sense that he should take care in driving, because he knew that there were small children there.

If from the evidence as well as from the ocular inspection made by the court it appears that the private road, before reaching the house, is enlarged in the curve at a distance of more than six meters, there being, therefore, sufficient space to drive a vehicle without any need of taking the curve when passing the house at a distance of less than two meters, and if it is further shown by the evidence and the ocular inspection that the place where the blood stains re-

mained, where the child fell dead, were on the boundary line between the road and the backyard of the house, at a distance of one meter and seventy centimeters from the rear corner of the main portion of the house, and if to this we add the fact, proved and admitted by the defendant, that he failed to give any warning, either when approaching the house or when taking the curve, we are bound to conclude that the lower court did not commit error in deciding that defendant Acosta was negligent and that such negligence was the proximate cause of the accident.

The fact that the boy should collide with the side of the truck and that defendant did not see him before the impact, is not, considering the special circumstances of this case, sufficient to excuse the defendants from liability. As was stated in *Messer* v. *Gentry,* 290 S. W. 1014, 1016: ''If defendant's negligence placed his car where the child ran against it (the side), he would be responsible the same as if he had struck the child with the front of the car.'' If, as we have already said, the defendant was negligent in failing to sound a signal before taking the curve with his truck and in passing so close to the house, knowing, as he did, that in that place there were children, the fact that the injured boy should run out of the backyard of his house at that same moment and collide against the side of the truck should have been foreseen by defendant Acosta and, therefore, it should not excuse the defendants from liability. The child was entitled to be and run in the place where he was; he could not see that a vehicle was coming (it was proved that from the backyard in front of the kitchen the road beyond the curve could not be seen) and independently of any reason he might have had for running out, his acts can not be considered as constituting contributory negligence. We are not deciding that a child can not be guilty of said negligence, but, first, that in this case it was not proved, and second, that we can not hold that plaintiffs' son acted, under the surrounding circumstances, in a different fashion

from any other child of like age, intelligence, and preparation. Since 1914 this court (citing the Supreme Court of Maine) in *Font* v. *P. R. R. L. & P. Co.*, 21 P.R.R. 7, 13, expressed itself as follows when considering the capacity of a child to commit negligence "Though children are not by law holden to the exercise of the same extent of care that adults are, and though the age and intelligence of a party are important factors in determining whether due care has been used, yet the plaintiff in this case was bound to use that degree or extent of care which ordinarily prudent children of her age and intelligence are accustomed to use under like circumstances."

This doctrine is similar to the rule set forth in 2 Restatement of the Law, Torts, Negligence, § 464 (2), p. 1228, as follows:

"(2) The standard of conduct to which a child should conform is that to be expected from a child of like age, intelligence and experience."

When discussing this rule the Restatement makes reference to the commentary appearing in § 283 which sets forth what should be the conduct of a reasonable man ("Unless the actor is a child or an insane person, the standard of conduct to which he must conform to avoid being negligent is that of a reasonable man under like circumstances") and states, on page 743, in part, as follows:

"Children. A child of tender years is not required to conform to the standard of behaviour which it is reasonable to expect of an adult, but his conduct is to be judged by the standard of behaviour to be expected from a child of like age, intelligence and experience. A child may be so young as to be manifestly incapable of exercising any of those qualities of attention, intelligence and judgment which are necessary to enable him to perceive a risk and to realize its unreasonable character. On the other hand, it is obvious that a child who has not yet attained his majority may be as capable as an adult of exercising the qualities necessary to the perception of a risk and the realization of its unreasonable character.

"Between these two extremes there are children whose capacities are infinitely various. The standard of conduct required of such a child is that which it is reasonable to expect of children of like age, intelligence and experience. . . .

"It is impossible to fix the definite age at which children are capable of negligence or to fix the age at which a child, or any class of children, is able to appreciate and cope with the dangers of any particular situation."

"If this wise doctrine is applied to the case at bar we can not hold that the lower court erred in deciding that plaintiffs' son, a small country boy six years old, in acting as he did by running out of the backyard of his house, only acted in the same manner as "other children of like age, and under like conditions and circumstances," would have acted, for, as it was further and properly stated by the trial court: "If the child could not see the truck before approaching the house because the main portion of the house obstructed the view, and if he had no warning of the proximity of the truck, the child can not be considered negligent."

█ According to the established facts we can not hold either, as urged by appellants, that the child's mother was guilty of negligence in permitting him to run out when the truck was approaching the house. If the defendant failed to sound any signal when it approached the house and the mother of the child realized that the truck was in front of the kitchen when the accident had already taken place, she could not have stopped the child, under any circumstance, from running away from her because of the fact, unknown to her, that the truck was approaching the house.

█ The appellants argue to a great extent in their lengthy brief the doctrine of unavoidable accident as applicable to the facts in the present case, and they cite our decisions and others from the Continent, to the effect that when a person occupying a place of safety unexpectedly abandons the same and suddenly rushes in front of a vehicle, the driver is not liable for the consequences of the accident.

This doctrine is not applicable to the facts which the lower court considered as proven in the case at bar. By failing to believe the evidence which attempted to establish that the accident occurred when the truck had completely passed the curve and was beyond it or in front of the kitchen of the house, the trial court did not err in considering this doctrine as inapposite.

█ As to the amount of compensation and attorney's fees allowed, we are of the opinion that the trial court did not abuse its discretion in fixing the former in $3,500. However, considering the special circumstances as to the manner in which the accident occurred we can not hold that the defendants incurred in obstinacy in defending this action, and, therefore, we are of the opinion that the lower court erred in imposing attorney's fees.

The judgment appealed from should be modified by striking the $300 as attorney's fees, and as thus modified the judgment is affirmed.